## Commonwealth v. Crews

*R. Scott Cramer, assistant district attorney,* for the Commonwealth.

*Jerry A. Philpott* and *Steven V. Manbeck,* for defendant.

QUIGLEY, *P.J.,* July 10, 1991—The court at an argument conference attended by counsel for the Commonwealth and defense reviewed the post-verdict motions presently pending before the court. We will note the existence of a full transcript which was produced on a day to day basis and supplementation thereto consisting of matters such as sidebar conferences which were not initially included in the original transcripts for purposes of expediting daily transcripts.

The first issue deals with the issue of change of venue or venire. We addressed this matter pre-trial and denied the initial request of the defense for a change of venue or venire. However, as we feel we are bound to do, we permitted this to be deemed a

continuing request and were particularly mindful of the issue, especially during jury selection process.

We are satisfied that the jury ultimately selected was abundantly qualified to be a fair and impartial jury based on our proceedings at individual voir dire. At no time did this court consider the venue or venire issue to be a viable issue and are satisfied as noted above as to the ability of the jury to be fair and impartial.

With respect to the defense motion concerning the suppression of evidence as a result of an illegal arrest on a bridge on the Potomac between Maryland and West Virginia, we substantially similarly dismissed that at a pretrial stage. We had no problem with the arrest insofar as probable cause for same was concerned, as ample probable cause existed and was testified to by the federal officers who effected the arrest.

It is correct that this court approached the arrest issue primarily, if not exclusively on the issue of Pennsylvania law. We do so for reasons at the time being of the opinion that Pennsylvania law is even more restrictive than federal law on this subject. We were unimpressed with conflict of law argument in this matter and will hold our original decision that the arrest was legal.

Defense raised initially at pre-trial a request that additional information be provided with respect to one Michael Reese whose blood was apparently forwarded to the FBI laboratory for analysis and a report thereon was disclosed to the defense, at least such of the report that indicated there was a Michael Reese who might well have been a suspect.

We denied that request out of hand because we felt that unless the defense could be more specific as to why they wanted information concerning Michael Reese, that the request was too general and not

within the mandatory or discretionary requirements concerning discovery. As the trial progressed, we heard about Michael Reese and saw his DNA tests presented in connection with other DNA evidence and find that even if we would have had the ability to look into the future at the time of the initial request, that to have disclosed Michael Reese, even on the basis of what ultimately was disclosed, that would not have been of any benefit to the defense. It is true that defense may well have looked into the Michael Reese situation further based on whatever records they may have received from the Commonwealth to some benefit on the part of the defense. Unless some legitimate reason can be identified in advance, this court will continue to deny fishing expeditions.

The issue of DNA was discussed at considerable length prior to the trial and at the trial. At the outset, this court will state bluntly that it, in its considered judgment, considers the DNA issue substantially a "non issue." In a nutshell, the evidence of identification of the assailant was so overwhelming in this case, that the DNA evidence contributed little if any, to the total quantum of evidence abundantly sufficient to identify Mr. Crews.

Keeping that basic uncontradicted proposition in mind, although of course the quantum of evidence was not known at the pre-trial level, we find that the court's actions with respect not only initially concerning DNA, but during the trial and with respect to a supplemental motion filed concerning DNA were entirely warranted and in fact demanded.

It is correct that a *Frye* standard hearing has been pretty much standard operating procedures in other jurisdictions. Basically the *Frye* approach provides a forum whereby the issue of the general reliability of DNA evidence is to be presented and ruled upon by the court. This judge was absolutely satisfied that

the time has come based on myriad authorities, legal and medical, for the acceptance of DNA as a viable tool for forensic purposes. For example, it is beyond question that DNA can and is being used routinely for exclusion purposes. It is recognized by the court that the use of DNA to identify or to "fingerprint" an individual is not as wide spread as it certainly will be one day for good and sufficient reasons.

Parenthetically, we should note that the ultimate use of DNA in this case was not in fact used to "fingerprint" Mr. Crews, but was simply one item in the aforesaid myriad evidence as to identity. We held without any hesitation that the *Frye* standard could be achieved legally in this case by the concept of judicial notice and feel that was an appropriate decision.

With respect to the contention that he was denied a fair trial because of the court's admitting DNA evidence and its alleged "aura" we simply find that position unpersuasive. Again, DNA is a non-issue as far as this court is concerned. Realizing that in fact an issue doesn't become a non-issue simply because we say so, we are constrained to comment on the defense contention that the defendant was subjected to a gross prejudicial effect by the introduction of the evidence. It should be noted that one of the objections to the use of DNA identity evidence is evidence concerning the probability that a certain person contributed a certain bodily fluid. In some instances, this court saw figures as much as 840 million to one that the contributor was in fact a given individual. Those figures go as high as 1.3 billion to one depending on the race of the alleged contributor of the bodily substance.

It is also recognized by this court that the statistical data that usually accompanies testimony along the lines admitted in this case is not as extensive as

it could be at some point. We suggest that the statistical data will increase substantially over the years, but simply because a technique or procedure is new, is not sufficient reason to exclude it. As noted, we felt that the *Frye* standard had been met in the literature and feel there is an inherent reliability.

We recognize that to submit statistical probability information may well cause a prejudicial effect feared by the defense. However, the only thing that we admitted in connection with statistical probability was simply the testimony of the FBI officer that he had conducted numerous DNA testing and that he had never seen matches in more than one probe with the possible exception of two probes. In the case at hand, there were three matches and one probable, although the fourth was not called a match because of the FBI's extremely conservative standards with respect to DNA testing.

We explained to the jury the nature and effect of expert testimony and the jury was free to attach weight, if any, to the testimony of this gentleman who was in our judgment, thoroughly qualified as an expert in the field, but we do not believe that the jury was presented with DNA evidence from the FBI agent of any nature that would have destroyed its ability to be objective in any respect.

We mentioned the term "statistical probability" and hasten to advise that we did not intend to suggest that any statistics were in fact admitted into this case. We mentioned that the agent has experience in conducting tests and the only numbers involved, to our recollection, dealt with the numbers of tests he may have run and with respect to the probes involved in this particular case. Accordingly, none of the feared statistical probabilities ever entered this case.

Concerning the court's refusal to grant a continuance to evaluate samples submitted by the FBI

mid-trial, we agree that samples did come in at some point during the trial. We further agree that the defense presented evidence that it would take considerable time to independently analyze the samples and we will refer to defense supplemental motion which, among other things, indicates that the swabs presented by the FBI to Dr. Atkin, the defense expert, did not contain sperm.

This is interesting of course and certainly it would have been desirable if both sides would have had the opportunity to have full and complete unfettered, unhurried opportunity to thoroughly and completely evaluate all forensic type evidence, but in view of the court's previous position concerning the non-issue status of DNA, the court is unimpressed with the need for post-trial relief, even assuming everything the defense suggests in its supplemental motion to be true and correct.

Defendant also complains of the failure of the Commonwealth to disclose specific aggravating circumstances in accordance with Rule 352 in a timely manner.

This issue was also raised pretrial and our research has disclosed that no other cases exist clearly on point. Rule 352 is a relatively new rule in that it was effective on July 1, 1989.

This court is not disposed to change its original ruling, which to the effect permitted the Commonwealth to seek a death penalty, even though it could be suggested there was a violation of the literal terms of the rule. We believe that the Supreme Court should make a pronouncement as to the effect of compliance or non-compliance as the case may be in conjunction with this rule.

With respect to the ultimate aggravating circumstances which were submitted to the jury, we submit that none of them were a secret and a cursory review of the information in this case along with

accompanying file documents, would have clearly indicated that two murders could well have been committed on that day, that there was a robbery, that there was a rape, and there could well have been grave risk of death to another person during the commission of the offense. The question of torture may well not have been known to the Commonwealth and in fact Commonwealth counsel has suggested that to be the case, same being developed later, apparently after consultation with a forensic pathologist.

It is true that at arraignment, discovery technically is only to be contemplated. Accordingly, it can't be argued that the defense would have or should have known all of the circumstances that would appear following compulsory discovery at the time of arraignment. Perhaps this argues against literal enforcement of the terms of the rule. But in any event, based on the information and court documents, the majority of the ultimately submitted aggravating circumstances would be ascertainable with little or no diligence. The torture aggravating circumstance did come about later and we are satisfied that it did not have to be disclosed at the time of arraignment.

Since the Commonwealth did at arraignment state on the record that a death penalty would be sought and since we are not aware of where the defense was in fact prejudiced by failure to be advised up front, and since we believe that this rule is directory, although it should be complied with if at all possible, we are not constrained to grant defense relief which would be to overturn the verdict of this jury on the issue of penalty and to impose life imprisonment instead.

With respect to the statement of the chief investigation officer that Mr. Crews didn't speak with

them after *Miranda* rights, in the context with which this answer came up, which was somewhat non-responsive, we agree that this could not have been anticipated by either side and thus prevented. However, it is such a small matter that in the overall general picture of things, this is clearly harmless beyond a reasonable doubt. The same response would be to the Commonwealth question a short period later in the conduct of the trial but we would also add that we did not find the comments by the state police officer to be anything other than factual and highly questionable in our mind as to whether usual concerns in this type of situation need be addressed.

As part of the scenario testified to, the defendant apparently admitted that he was Paul David Crews as opposed to David Casey Horn and the defense suggests that this is a discovery problem because the Commonwealth did not disclose this "confession" to the defense. We find no merit in this contention.

The court ruled on the issue of inflammatory crime scene and body photographs and also its inclusion in items in evidence that were taken to the jury room.

We instructed the jury as per the suggested charge with respect to possibly inflammatory photographs and are of the opinion that the court exercised proper discretion in weighing the probative value as against the inflammatory affect on the jurors and again find no merit in this contention.

Although the defense has indicated that it cannot point out where it interposed an objection to the testimony of Geoffrey Hood's mother, the court's recollection is in fact that the defense did approach on that issue, and although the record simply states "off the record," it is the court's recollection supported by counsel that defense did in fact interpose

a timely objection to the testimony of Mrs. Hood. It did so for the reason as set forth in point 12 in post-verdict motion.

Certainly the appearance of the decedent's mother can invoke an emotional response from the jury. However, it cannot be argued that the testimony of Mrs. Hood was not in fact probative, for indeed it was. It definitely identified for the first time specific items of personal property that belonged to her son and were subsequently found in the possession of Mr. Crews. This was the first witness to the court's recollection, that specifically puts Geoffrey Hood's personal property in the possession of Mr. Crews. There were items of evidence otherwise supporting this and it could be argued that this was cumulative, although not literally cumulative at the time offered. Again, we feel that the evidence was entirely relevant and exercised our discretion, we believe properly, in permitting this guidance.

The defense suggests that the court committed error in failing to indicate that relations after death does not constitute rape. There was no rape charge and the rape is one of the aggravating circumstances in conjunction with the death having occurred during the perpetration of a felony. There is some dated authority on the proposition that this is a viable argument. However, the evidence clearly belied the proposition that the female victim was deceased at the time of the intercourse. One would likely not have to tie her hands under those circumstances.

The court properly denied defense offer for a second expert to testify as to the effect of cocaine and alcohol during the penalty stage for the simple reason that there was no positive evidence in this case that the defendant had imbibed mind altering substances. We did permit, as we believe we were

required, the testimony of a psychiatrist as to the pathologically germane history given to him by the defense. In no way was there positive evidence other than medical history evidence to suggest the imbibing of these substances. It would have countenanced speculation based on a dearth of evidence in the record to have permitted a second expert to testify as to the effects of these substances. It should be noted that the issue of the second expert was thoroughly examined in an in camera proceeding in, chambers by virtue of a defense offer. This court ruled that in the event the defense was unable to present positive evidence concerning the imbibing of cocaine and/or alcohol that it would not permit the second expert.

The chain of custody argument advanced by the defense, we feel is of no merit because, in our judgment, adequate safeguards are contained in the FBI procedure relative to receipt of evidence, storage of same, testing of same, etc., to safeguard results. The thrust of the defense complaint deals with up to the point that the items were submitted to the FBI laboratory. The court's recollection of the procedures to safeguard the identity of the substances prior to submission to the laboratory were likewise adequate. And again, we state the DNA issue should not be viewed as other than a footnote.

The rest of the points including the supplemental motion we believe have been adequately addressed since it clearly would have been inappropriate for the court to rule as a matter of law that there was reasonable doubt and also would certainly have clearly been inappropriate for the court to suggest that there was insufficient evidence.

By way of post script, an additional point has been developed by the defense to the extent that this court apparently permitted the jury to attach its own

weight and significance to a footprint on the elbow of the decedent when it is suggested that an expert could not draw a comparison.

Really, the court sees no merit to this position also since the argument that the expert could not draw a comparison would probably greatly detract from the weight of the evidence. In any event, it was in the jury's purview to attach whatever weight or significance it chose with respect to the footprint.

For the reasons set forth above, we will deny post-trial motions in this matter.